Good morning and welcome to our court. At the outset, Judge Branson, I wanted to welcome and introduce to you our visiting judge, Judge Ursula Ungaro, from the Southern District of Florida. We're delighted to have her help us with our work this week. She has served with great distinction in the Southern District of Florida for many years. She was appointed by President Bush, Bush 41, in 1992 and she has served thereafter on that court and she's also sat with us by designation on many occasions and so we're delighted, Judge Ungaro, to have you join us and make sure we don't make too many glaring mistakes. Thank you. I'm delighted to be here. Second observation for you, when you make your argument, you can safely assume that we've had a chance to review the briefs, the record excerpts, and in some cases we've read the record itself, so feel free to go right to the heart of your argument as you proceed. Third and last observation, our time system. There's a clock that'll tell you how much time you've got left, how much you've used, and there's a green light, means of course you can proceed. There's a yellow or amber light as a two-minute warning. The red light means that your time is up and we'd be much appreciative if you could bring your remarks to a conclusion when the time is up. With that, we will proceed with the first case, which is the United States v. Yarbrough. Good morning, Your Honors, and may it please the Court, Jay Towne for the United States. The District Court's suppression order should be reversed for three reasons. First and foremost, the Court required the government to prove that Monroe, Investigator Monroe, actually believed that someone dangerous was in the Yarbrough home. Second, the Court applied a divide-and-conquer approach to the totality of the circumstances. And third, even if the sweep was unreasonable, it did not taint the Yarbrough's consent because the sweep was not purposeful and was not flagrant. First, the Court suppressed the shotguns because the government had not met its burden of proving Monroe's subjective intent. But the government never has that burden. Monroe's subjective intent is irrelevant, as this Court and the Supreme Court have repeatedly made clear. Instead, what matters is what a reasonably prudent officer would do under the totality of the circumstances. The District Court's ruling is self-contradictory in this case. On the one hand, the District Court found that Investigator Monroe did not believe someone dangerous was in the house, but on the other hand agreed with the Magistrate Judge that Monroe conducted the sweep for officer safety, that the sweep was not a sham, and the sweep was done in good faith. Thus, even taken on its own terms, the District Court's ruling cannot be affirmed. If the District Court had applied the correct test, an objective test, then it is objectively clear that the Court would have ruled there was reasonable suspicion to conduct the protective sweep. Second, the Court also erred in its analysis of the sweep's objective reasonableness and the totality of the circumstances. Even here, the Court continued to apply a subjective intent analysis and requirement of the government because it discounted the government's arguments as after-the-fact justifications or lawyering. In fact, every objective analysis isn't, by its very definition, an after-the-fact analysis based on the totality of the circumstances. That is why it is an objective test. That's why we have an objective test. But even beyond that, the Court's analysis of the circumstances in this case... Tell me specifically, Counsel, what objective basis there was for an officer to believe that the house contained a dangerous person after they properly went in and arrested Mrs. Yarborough and took her outside, cuffed her, cuffed her husband, and took her outside. Two other individuals who were associated with the cars that were in the driveway. What reason did they have to believe that they had to go back in the house for a protective sweep when they went in there properly in order to arrest two people? They had accomplished that objective. They brought them all outside. There's got to be some reason, some articulable reason to believe that there was someone else in that house that was going to come out, guns a-blazing, while they were sitting on the lawn, standing on the lawn, processing. At least two of the people had to be processed, cuffed, put in a car, and taken downtown. Yes, sir. But what I want you to zero in like a laser beam for me is what articulable basis there was for the two people who had secured their objectives and had arrested the two people they went to arrest. Yes, sir. And that articulable suspicions that Investigator Monroy had to conduct the sweep began before their arrival, even before the day of the arrest. And so to your point, I will get to it. Over the course of the month leading up to the arrest of the Yarboroughs, there were a number of tips that came in to Investigator Monroy via text message, email, telephone, where the Investigator Monroy was informed that there was high levels of activity, what he understood to be drug activity, in the Yarborough home. Now, just so that I'm clear, that was an anonymous tip or did that come from a known source? The tips, as I'm describing them, are anonymous. According to this record, are all anonymous. Yes, sir. So the anonymous tip says, one, there are a lot of people going in and out of that house, and two, maybe there's some drug activity. Is that overstated, understated, or is that about right? Well, that is about right. I would add that Investigator Monroy, he himself at least believed that the activity described going on at the Yarborough home was drug activity. What specifically were they told by the tipster about, not just a lot of people going in and out, but that there were drugs in the house? The record does not indicate, Your Honor, that there were any tips that there were drugs in the home, only that there was a high level of activity, people coming and going. I'm just talking about from the tipster. Then we'll go to what the officer might reasonably believe, but I'm just talking about the aggregation of the anonymous tips. Just that there were lots of people coming and going. And that at all hours, there's more factors than that, if you'd like me to continue with the totality. Please. Yes, sir. But I wanted you to tell me first what the tipster says. The tipster does not, there's nothing... Forget what he didn't say, just tell me what he did say. The tipster said that there was lots of activity going on at that house. I don't believe the record indicates any specific drug that is being either dealt, distributed, or used at the Yarborough home. And there's several tips until the day of the arrest, right? That is correct, by email, text, telephone. But that is just a part of the totality of these circumstances. No, no, I understand that. I'm just trying to break it down piece by piece. Now tell me the second piece of objective evidence that articulably gives a basis for going back in after the two folks are arrested that they went to arrest in the first place. Yes, sir. So as Investigator Monroy went to arrest the Yarboroughs on that day, he was told prior to that arrest that everyone was there. Not that they were there, not that they both were there, not that Mr. and Mrs. Yarborough were there. Very clearly, the record indicates that everyone was there. When Investigator Monroy and Investigator Sims arrived at the scene, they discovered three men in the driveway. Detained two, and you detain those two, not Mr. Yarborough, he was arrested. Detained those two for officer safety purposes. They stay with Sims. He announces himself at the door, Monroy does, is noticed by Mrs. Yarborough, whom he also has a warrant for. She runs through the house, runs through several rooms, goes behind. Before we get to that point, I take it they detain two, they bust Mr. Yarborough, and they ask him what? Is his wife in the house? Is there anyone in the house? That's correct. And he indicates, he cooperates and says she is in the house. They ask is there anyone in the house or just specifically is the wife in the house? I'm not exactly certain if it was that specific, Your Honor, but I do know that that conversation indicated that Mrs. Yarborough was in the home. Right, because I thought that what they asked him was whether Mrs. Yarborough was in the house. He says yes, and one of them goes in, and the other one stays with the three outside. That is correct, and there is nothing in the record that indicates that Monroy asked anyone is there anyone else in the home besides Mrs. Yarborough. He then goes to the door, announces himself. She sees him. She runs to the home and locks herself in what we later determined to be a bathroom. He follows her in, arrests her, and brings her back outside. Immediately after bringing her back outside, and she was detained, she was cuffed with Sims and the others. He went back in to conduct a protective sweep. That sweep lasted less than a minute. So before he went in, what did he know about the content of the warrants, what the charges were? The record is like a little murky. The record is very slight on that. We will concede that point. That is something that we would have liked to have brought out here today as well. There is nothing in the record that indicates that Monroy knew of the criminal history of either Mr. or Mrs. Yarborough. That would have been handy information for this court. But he knew there was a warrant. He was serving the warrant. It was a probation revocation that involved narcotics. Did that go into evidence, the probation warrant? Is that part of the evidence? The warrants were not entered into evidence. Neither was the record of either of the Yarboroughs. But I thought there was testimony that they were arresting him for that reason, for probation revocation. Yes, sir. That is correct. But the warrants themselves are not a part of this record. So the tips and circumstances of this case more than justified a reasonable suspicion. Her furtive gestures alone by running through the home and secreting herself in the bathroom, not cooperating with law enforcement, that alone was enough to reasonably suspect that everyone was there, was not the four individuals that had been detained, that there could be more people. Tell me how. If you've got one person that Mr. Yarborough disclosed his wife was in the house and, granted, she ran to the bathroom, why does her running to the bathroom indicate that others might be in the house? Well, it doesn't indicate that others might be in the house. It does give rise to reasonable suspicion that someone else could be in the home that is dangerous because of her furtive gesture, of her not cooperating with law enforcement, in fact, doing exactly the opposite of what the three men in the driveway did. That would suggest to any reasonably prudent officer that it would be necessary to ensure that no one else was in that home because he is now, in Investigator Monroy's instance, now not receiving cooperation. He does have that sort of reasonable suspicion that this is now a dangerous place. It's also unfamiliar territory. He's on unfamiliar turf, I believe the case law uses that language. And that is, in and of itself, reasonable for an officer to ensure officer safety. I would like to turn briefly to the consent, though, even if we were to assume arguendo. And the facts in this case are much like Hollis as it relates to the suite. But if you were— Oh, wait a second. I don't recall there being any testimony about him being on unfamiliar turf. And, actually, hadn't he been out to the property several times to try to serve these warrants? But he had never been inside the home. The record indicates that he— He also hadn't seen any activity at the home. Well, he had not seen the Arborals. That is correct. He had tried to arrest them a couple of times. As it relates to consent— I just wanted to dwell further on the question Judge Ungar asked you. Does the record reflect whether he did see lots of activity? He'd been there a couple of times to serve the warrants. And he went to the door, and there was no one there, as I understand it, right? Prior to this—prior to the day. I think on multiple occasions. That is correct, Your Honor. I see I'm— That's all right. Yes, sir. When he goes on the earlier occasions, does he see multiple activity? Does he see lots of folks coming and going? The record does not— Because I don't think he says that, but maybe I missed it. He does not say that, but he doesn't say it either way. I don't believe that he did see any activity, but I don't think the record indicates that. The tips certainly indicated that over the course of that month prior to the arrest. How many prior occasions did he go before he was able to successfully execute the warrant for arrest? To my recollection, it was two, Your Honor. Okay. You can go on to the next issue. You wanted to talk about the consent providing an independent basis for the search, even if this wasn't fairly a protective sweep. Yes, sir, and I know that we are short on time, so I'll say that nothing in the record supports a finding that this sweep was flagrant or misconduct that would demand the suppression of the shotgun evidence. No contraband was exploited at all by law enforcement. In fact, the magistrate and the district court judge both agreed that the sweep was not done, that it was done in good faith, that it was not a sham. It was done for officer safety, and, in fact, it was brief, it was temporal in its scope, and the officer did leave the evidence of contraband behind, not exploiting the methamphetamine that was found in the Altoid can. And what else was this officer to do but to remove those shotguns from that home for officer safety? With that, we ask that this court reverse the district court's suppression order. Thank you for your time. Thank you very much, and you have reserved your full time, Mr. Turner. Thank you, sir. Ms. Darby. May it please the Court. Please. The government has alleged various errors that the district court committed in her analysis of the protective sweep in this case, and we will address those. But as an initial matter, the government is seeking to muddy the waters here because the court's ultimate conclusion in this case was correct, that Officer Monroy, that his search in this home was not conducted with a reasonable suspicion that a dangerous person remained inside the home, and for that this court should affirm. As an initial matter, I would like to address the taint analysis that the government has raised and just note that in this case they're conflating two different standards. One is the standard addressing a search that occurs after consent has been given, and that is where the taint analysis applies, but that's not what is at issue here. What's at issue here is the search that took place before this consent was given, and the Yarborough's consent later cannot retroactively validate this search, this initial sweep, which was unreasonable because it wasn't supported by a reasonable suspicion that a dangerous person remained inside the Yarborough home. It's important to look at this case. The government makes the point to facts that Officer Monroy knew before he arrived at the home, but what that does is ignores the snapshot of facts that Officer Monroy knew as he was going into the home. As this court has discussed, for example, the government places great weight on these anonymous tips, tips that Officer Monroy himself testified he had no reason to believe were accurate or truthful and were never corroborated. Did the tipsters say the Yarborough's were there on the day in question? The tipster did, Your Honor, and the government argues that that's predictive information, but the Supreme Court in J.L. addressed a similar situation. In J.L., a tipster indicated that there was going to be a black man at a bus stop and he was going to have a gun and a plaid shirt. And the court recognized that while that does have some value, it has the limited value of indicating just where that person is. It doesn't have the predictive value that can corroborate an anonymous tip. So, for example, if the tip was able to anticipate future activity, that would be potentially corroborative, but that's not what happened. Did the tipster say everyone's there? Were those the words that came out in the testimony? Yes, Your Honor. Was there any explication of what the officers took everyone there to mean? No, Your Honor. Probably that question was asked to the officers, maybe not. It struck me it was a very brief sort of suppression hearing. There was a lot of stuff that wasn't asked and didn't come out. But was there any discussion about what it meant when the tipster said everyone was there? Your Honor, I believe that, and I'm looking at page 32 of the suppression transcript, I believe that the magistrate judge asked, you know, were there more specific details, asked to that, you know, was there a number of people alleged to be there, and, you know, that information wasn't included in the tip. So, and additionally, as this court has noted— Didn't the officers have reason to believe that the Yarboroughs, in some sense, were involved with drugs, just looking at the arrest warrant itself? Well, Your Honor, it's not clear that the arrest warrant was in evidence or that Officer Molloy— No, no, I accept that the arrest warrant wasn't in evidence, but they knew they were going in to arrest Mr. and Mrs. Yarborough. Did they know what they were going in to arrest them for? Your Honor, I don't believe there's testimony as to that. The warrants never came in? No, Your Honor, not to my knowledge. So what evidence is there about what they were looking for when they went in? Presumably there's testimony from the officers saying we went to arrest A and B. Here's why. I'm just asking, what did they say? Arrest warrants. They indicate that there were arrest warrants. We went in to execute an arrest warrant. We had no idea what it was for, what, wherefore, or why? Your Honor, I don't believe that they testified as to what the arrest warrants said. Or in any form what they were arresting them for, other than that a neutral magistrate had given them an arrest warrant? I believe that's correct, Your Honor. It's inexplicable that an officer wouldn't want to know what he was arresting them for, isn't it? I mean, potentially yes, Your Honor, but going off this record, it's not clear. I'm just asking what's in the record, and I'm bound by it like you, but I'm just asking you to help me with the record. Yes, Your Honor, and I believe the district court mentioned— Well, did they not know that they were going in for a parole revocation? I thought there was testimony at least about that much. Your Honor, I believe that the information that this was a parole revocation arose not from testimony but arose from a filing that the government, like one of the government's responses to Mr. Yarbrough's motion to suppress. And the district court did mention it, did mention that even if this is— even if the officers were aware that they were coming to arrest Mr. Yarbrough on a bond revocation for possession of paraphernalia and simple possession of drugs, that doesn't corroborate that this is a drug house which suggests a high level of drug activity. And that's what— What about the fact that the government is saying what gave the officer the ability to do the protective sweep is that when they entered the house to arrest Ms. Yarbrough, she ran into the bathroom. Isn't that consistent with drug activity? To some extent it does. I mean, we do recognize that flight can signify some awareness of wrongdoing. But again, that ignores the facts that Officer Monroy learned when he went into the bathroom. So, for example, he testified that when someone runs like that in a home, they're running into a bathroom, they're potentially trying to flush evidence down the toilet, trying to conceal evidence. But he didn't hear sounds to indicate that evidence was being destroyed. And when he went into the room to arrest Ms. Yarbrough, he didn't testify that he saw evidence being destroyed or that she was trying to conceal evidence. And he was able to go into the bathroom, detain her, take her outside when she was detained. And while he was in the home, he heard no one else. And he saw no one else. And he saw nothing to corroborate that there were weapons in the home. And he saw nothing to show drug activity in the home. So when you look at the snapshot of facts of when Officer Monroy reentered the home to do the sweep, it simply doesn't show a reasonable suspicion, even in light of the flight. So if the officer has arrested Ms. Yarbrough and has exited the home, isn't there still a justification for a protective sweep? Because if, in fact, there is somebody else secreted in the home, that person would present a danger to the officer, even though the officer is outside. Potentially, yes, Your Honor. And in a case such as that, a protective sweep would be appropriate if there are articulable facts that create a reasonable suspicion. All right. So the central question is, once they went in, took Mrs. Yarbrough out, cuffed them all, had them all on the lawn, would a reasonable officer have a reasonable basis to believe that maybe there's someone else in that house that they'd best check while they're in the process of handling the paperwork, et cetera, and taking the two of them under arrest? No, Your Honor. That's the question, whether there was something else that might have yielded a reasoned inference for suspicion. Correct, Your Honor. And here there is nothing to suggest. There is nothing to create that. Well, he argues that what you have is, A, the tipster saying that there was lots of activity. B, that everyone was there, suggesting a multitude of people. Doesn't necessarily mean it's more than four, but it could be. C, that they knew they were there to arrest at least one of them for a parole revocation involving drugs, some drug crime of some kind, not a distribution crime, but some drug offense. And then when they went in to arrest her, she fled. You have flight, which yields consciousness of guilt about something. So they go in and they bust her and they take her out. Is there some reason for them to believe, out of some caution, that maybe we'd best just check this place out before we proceed any further? Maybe somebody else is there and is going to come out with guns a-blazing. You don't need a lot, but you need some articulable basis where they were concerned about their safety rather than using it as a subterfuge to conduct a search. And we know the search they conducted really was a sweep. There's no indication there was anything more than he went in, he looked around, and he went out. Yes, that's correct, Your Honor. But here, they didn't have reasonable suspicion. And the government, in focusing on things like the tip and the flight— But before you—let's talk about the flight. What inference could an officer reasonably draw from the fact that when they went to effect a warrant in a home, which they had every right to go into because the magistrate gave them the right to do it, and she fled, does that yield—went into the bathroom—does that yield some inference that maybe there's someone else in the area? That's the question. It doesn't suggest that there's someone else in the area. As Officer Monroy testified, this information could be relevant to show, for example, that she was trying to conceal contraband. And accordingly, if there's—for example, if this were like an exigent circumstances search, it would be a very different analysis. But her flight didn't indicate that another dangerous person was in the home, and to the extent that it suggested that she herself was trying to conceal evidence, any concern of that was alleviated when Officer Monroy was able to enter into the bathroom and see what she was doing. And I would just like— What about the fact that there were two cars outside? So does that give rise to a reasonable suspicion on the part of the officer that there may, in fact, be another person in the house that justifies the officer going back in? Not in this case, Your Honor, because, again, like this court has looked to multiple vehicles as an indicator that someone else could remain inside the home. But in this case, again, looking at the snapshot effects that Officer Monroy knew when he went into the home, they knew who those cars belonged to, who those two trucks belonged to. They knew that one was Mr. Yarbrough's and that one belonged to one of the other men in the yard. And both of those men had been detained. But did the officer—I mean, obviously, one car can carry multiple people. So just because the officers have detained the owners of the two cars, does that necessarily rule out that there's a stray passenger? Your Honor, it doesn't necessarily rule it out. But we would note that this court has clarified just a mere lack of information, absent articulable facts, isn't enough to justify a sweep. Let's assume, arguendo, that you're right on the first point. They come back and they make a couple of additional arguments. There's one I want you to zero in on, and that was consent. They came back out and they asked for consent. We have asked the basic question of whether the consent was tainted by a prior illegal seizure here of the weapons. We ask three questions. We look at to determine whether the consent somehow was tainted by those circumstances. We look at the temporal proximity of the seizure and then the consent. We look at the presence of intervening circumstances, and particularly the purpose and flagrancy of the official misconduct. Tell me how those cut, those factors. Clearly those are the necessary factors we have to apply. Yes, Your Honor. Start with the temporal proximity between the seizure and the consent. So he goes in on the protective sweep. He sees two shotguns. He brings them out, and then he asks for consent. That's what we have, right? Yes, and it was approximately 44 minutes later that they sought consent. So it's still the temporal— Forty-four minutes from the time that they went in on the protective sweep? Yes, Your Honor. Why is that too long? Your Honor— Or was it too long? It was— What does the timing tell you about how the issue should be decided? Your Honor, the 44 minutes is a short interval, and it suggests that the sweep did taint the Yarbrough's consent. And an important fact in this case, and it's something that the government— I mean, I'm sorry, it's something that the district court focused on. In this case, Officer Monroy exited the Yarbrough home without— And the government focuses heavily on this taint analysis, and the taint analysis applies to whether the search that occurred after the consent is valid. However, in this case, what we're concerned with, as far as their inevitable discovery argument goes— I'm not asking about inevitable discovery. That's a different argument. I'm asking about consent. Yes, Your Honor. In this case, it was only 44 minutes between the— Wasn't enough time elapsed to have purged the taint. Correct. What about the presence of intervening circumstances? Were there any? So, the government cites to a consent form that was executed by the Yarbroughs to permit them to search their home. Did they both sign the consent form? Yes, Your Honor. And it laid out that they had the right to refuse to consent. It did, Your Honor. But they signed this only after— They were shown the guns. Yes, and only after they had seen the officers go in and search their home. One officer. Yes, Officer Monroy. But the consent only produces the drugs. They're never charged with the drugs, right? Correct, Your Honor. Right? So, they're charged with the weapon. Mr. Yarbrough is charged with weapons possession. Yes, Your Honor, which was found before they consented to search. Right, so that kind—do you think that makes the consented to search essentially irrelevant for our purposes? Yes, Your Honor. As far as—aside from if the government—the government in its brief sought to raise inevitable discovery. Aside from the inevitable discovery argument, yes, what's concerned here is the pre-consent search. What about the purpose and flagrancy of official misconduct? Do you have real flagrant misconduct here? Well— What I would ask is when the officers go—when the officer goes in the first time to do the protective sweep, he doesn't ransack the house, he doesn't open up the cupboards, the oven, the doors to the closets, et cetera. He goes in, he sees the guns, he takes them, and he goes out. He doesn't see anybody there. So, you would—you'd be hard-pressed to say that their conduct was flagrant, wouldn't you? Yes, Your Honor. But nonetheless, what we would note is, you know, the focus on this is the Yarbrough's intent and they had—whether the Yarbroughs would have consented absent this illegal search. And here they had been brought face-to-face with incriminating evidence, which, I mean, in this Court's opinion in Delancey, it's specifically noted as a factor that could result in a—that could lead to a different result. Right, but we're just trying to see whether the consent was tainted. When I note the form says, I've been informed of my constitutional right not to have a search made of the premises, the property owned by me, and or under my care, custody, and control, without a search warrant, knowing of my lawful right to refuse to consent to such search, I willingly give my permission to the above-named officers to conduct a search of the premises and property, including all buildings and vehicles. That's one significant element in determining the voluntariness of the consent. The voluntariness of the consent or— Yeah, I mean, your argument is their will was overborne by the circumstances. There was a taint here and it pervaded everything that happened thereafter. And his argument is even if we were wrong on the front end, we were able to cure it and we did cure it. And we're just trying to explore what the circumstances were to see whether the taint was vitiated by the time, the circumstances, the flagrancy, the presence of any intervening circumstance. That's all. Any other thoughts you have on the consent issue is all I'm really asking. As to the taint analysis, no, Your Honor, but we would just, again, emphasize that the taint analysis that this Court is discussing deals with a search after consent has been gained and whether consent can—whether that consent is valid for the later search. In this case, the government is trying to argue that it— So was it your view that once they unlawfully obtained the guns on the front end, there was no way they could have gotten a valid, untainted consent? Not necessarily, Your Honor. What would they have had to have done to get a valid, untainted consent in your view? You know, additional time and— Well, if they had taken them downtown— Yes, Your Honor. Presumably by that point, someone would have had the good sense to say, go get a warrant from the Court if you want to search the place. So timing is sort of a two-edged sword here, isn't it? Yes, Your Honor. And, you know, even to the extent—even if this Court determines that the taint analysis— or that the later consent wasn't tainted, it simply doesn't correct the initial unlawful search. And the government pointed to nothing to suggest that the Yarbroughs would have given consent had they not seen the— The firearms, right. Yes, Your Honor. Thanks very much. Thank you, Your Honor. So why should we care about the consent search when the drugs were not the subject of the charges? Mr. Yarbrough was charged with being a felon in possession of firearms. Well, regarding the consent search, of course we care about the consent search because of the inevitable discovery doctrine. It would be utterly inconceivable. We wouldn't have found the shotguns had we gotten the consent and then inevitably discovered those shotguns. But the counsel made a point to say that when the shotguns became in the sightline of the Yarbroughs, that at that moment Mr. Yarbrough knew that he now had evidence contraband in his hand that was illegal for him to possess. There is nothing in this record that suggests that Investigator Monroy knew that Mr. Yarbrough was a felon. I don't quite understand your inevitable discovery theory. So if you take the consent out, how is it inevitable that they would have discovered the shotguns? Oh, if you take the consent out, then there wouldn't have been that secondary lawful search. But the secondary lawful search didn't turn up the shotguns. That's correct. But had they not done the protective sweep, the inevitable discovery… If they hadn't done the protective sweep, they wouldn't have found the shotguns. Yes, ma'am. Right. That's correct. So assuming arguendo like we did in Delancey, if the protective sweep was unlawful, we still would have found those shotguns giving a lawful consent search, secondary search that we got 44 minutes after the protective sweep. In the intervening circumstance of the consent form signed by both the Yarbroughs, along with the fact there is no flagrant conduct here, there's no misconduct by the officers, what are we punishing or deterring here? That an officer took two weapons from a home and then… Let's not do it. The problem is nobody here is condemning the officers. The problem is that the law seems to recover a reasonable, articulable suspicion that there's a dangerous person lurking in that house. That's the problem, right? And unfortunately, the record is thin. If we were to assume that the protective sweep was unlawful, the government certainly argues that the consent that we got from both of the Yarbroughs with the consent form full of their rights, fully understood, and then signed by both of them, that that search would have produced the shotguns that we gained in the protective sweep. But the shotguns themselves were not evidence of contraband. The only contraband that Investigator Monroy, according to this record, knew at the time of that protective sweep was the dope, was the methamphetamine, and he left that behind. He didn't exploit that evidence. There's nothing in the record that says he mentioned it to the mother, to the two men that were outside, or either of the Yarbroughs. He didn't mention the dope. He didn't exploit it. It wasn't flagrant. He cleared shotguns for officer safety, and that is why we asked this court to reverse the district court's suppression order. I have a question for you. Did the government raise before the district court the inevitable discovery doctrine? I'm sorry. Could you repeat that question, please? Did the government raise before the district court the inevitable discovery doctrine? No, ma'am. We were the prevailing party before the magistrate judge, so we don't have a duty to raise any inconsistencies with the magistrate judge's opinion and our opinion. We filed a motion for reconsideration after the district court ruled, and I didn't see anything in there either. Well, what we did is we—I mean, it's sort of form over substance. I think the magistrate and the government were saying the same thing, still are saying the same things, but we just adopted the language that was sort of adeptly described in the Delancey opinion by this court. I'm talking about once the district court had ruled, you filed a motion for reconsideration. Did the inevitable discovery doctrine, was that mentioned there? I can't find it in it, so I was just— No, ma'am. I don't believe that it was, and I agree with your summation of what you can't find. But we—but it was discussed at the lower level, and the R&R was accepted, and the credibility determinations were accepted by the district court judge, so it is sort of encompassed in that—in the magistrate's findings. And I can see I'm out of time, so thank you both. Thank you very much. Thank you all.  We'll proceed with the next case, which is Hall v. Delancey.